**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MAGGIE J., by and through her parents, | : | CIVIL ACTION |
| RICHARD J. and KIM J., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | No. 20-2782 |
| DONEGAL SCHOOL DISTRICT, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

**TIMOTHY R. RICE**                                                            **June 30, 2021**
**U.S. MAGISTRATE JUDGE**

An Administrative Hearing Officer rejected Plaintiffs' claims that Defendant Donegal

School District ("Donegal") failed to provide a free appropriate public education ("FAPE") to

Plaintiff Maggie J. for the school years 2015-19.  Hearing Officer Opinion ("H.O. Op.") at 38.

Plaintiffs argue the Hearing Officer erred, and that Donegal owes compensatory education for all

four years in which Maggie was enrolled in Donegal School District due to procedural and

substantive violations of the Individuals with Disabilities Education Act, ("IDEA"), 20 U.S.C. §

1400, et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504").  Pl. Br.

(doc. 11) at 42-49.  I disagree, and affirm the Hearing Officer's denial.

Donegal and Maggie's parents have had "different views" of Maggie's behavior and

academic achievements from her start with the district.  N.T. 2/26/2020 at 1932.  Informed by

her experience with Maggie's older siblings, Maggie's mother viewed even "benign" acts of

noncompliance by Maggie as potentially escalating into destructive behavior that could hurt

others and require hospitalization.  Id. at 1750-51, 1854.  She started to request special education

services for Maggie in September of Maggie's kindergarten year. S54[1] at 1. Donegal evaluated Maggie and provided her speech and occupational therapy during kindergarten, but her "fidgety and distracted" behavior, S9 at 2, did not stand out among the kindergarteners and was not found to warrant intervention. N.T. 9/24/2019 at 267; see also S54 at 45 (August 2017 email from principal to second grade teacher warning that "last year had its moments, but we did not feel it was as intense as the family would like us to believe.").

Nevertheless, Donegal continued to work with and accommodate her parents' requests. Maggie's first grade teacher charted her behavior on a daily basis, and agreed to email reports to Maggie's mother on an almost-daily basis even though Maggie's first grade Individual Education Plan (IEP) did not require it. P13. After behavioral goals were included in Maggie's IEP, her second and third grade teachers charted Maggie's behavior in 20- and 30-minute increments, sharing this information with her parents in real time.[2] P61, P75. Donegal enforced her parents' rules at school even when those rules made educating Maggie more difficult. P61 at 1; S54 at 16, 34, 50. Maggie's parents, however, continued to demand more intensive interventions, including removing Maggie from the regular learning classroom entirely and retaining her in first grade. S54 at 28, P59 at 2.

Whether due to the advocacy of her parents or the rigor of Donegal's interventions, Maggie continued to make meaningful academic and behavioral progress throughout her years in the district. S-30; N.T. 1/15/2020 at 1639. Even if Maggie's parents are correct that she could

---

[1]    The record in this case is comprised of a limited number of legal communications, the Hearing Officer's Opinion, and exhibits submitted to the Hearing Officer by Donegal and Maggie's parents. Donegal's exhibits are marked with the prefix "S" and Maggie's parents' exhibits are marked with the prefix "P."

[2]    The Hearing Officer observed that "that torrent of information was draining on both parties and prompted some amount of perseveration on smaller incidents." H.O. Op. at 27.

have achieved more progress if Donegal had done more, the record does not show she was denied FAPE. Instead, it shows she was offered "an educational program reasonably calculated to enable [her] to make progress appropriate in light of [her] circumstances." <u>Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1</u>, 137 S. Ct. 988, 1001, (2017). I affirm the Hearing Officer's decision.

**STANDARD OF REVIEW**

I review IDEA Hearing Officer decisions using a "modified de novo" standard, which requires me to give factual determinations "due weight." <u>S.H. v. State-Operated Sch. Dist. of City of Newark</u>, 336 F.3d 260, 269-70 (3d Cir. 2003). This means the factual determinations are deemed prima facie correct, and credibility determinations based on live testimony are accepted unless nontestimonial extrinsic evidence justifies a contrary conclusion. <u>D.K. v. Abington Sch. Dist.</u>, 696 F.3d 233, 243 (3d Cir. 2012); <u>see also</u> <u>M.G. v. N. Hunterdon-Voorhees Reg'l High Sch. Dist. Bd. of Educ.</u>, 778 F. App'x 107, 110 (3d Cir. 2019) (the party challenging the Hearing Officer's decision must overcome the "presumption that the Hearing Officer's findings were correct"). I review conclusions of law de novo. <u>In re Educ. Assignment of Joseph R.</u>, 318 F. App'x 113, 118 (3d Cir. 2009). "[S]tatute of limitations claims . . . are subject to plenary review as conclusions of law." <u>P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.</u>, 585 F.3d 727, 734 (3d Cir. 2009).

**FACTS**

Maggie was two and a half when she and her three biological siblings were adopted together following separate foster placements. N.T. 2/6/2020 at 1750-51. All four children had been removed from the care of their biological mother two years earlier for neglect. <u>Id.</u> at 1751. Maggie's parents attribute many of her behavioral and development difficulties to this early

trauma.  Id. at 1916.

Maggie's parents contacted administrators at Donegal Primary School before Maggie started kindergarten in 2015, requesting inclusion in the full-day kindergarten program.  Id. at 1757.  Although Maggie had received early intervention services from ages two to three, S9 at 1, then-principal Dana Blair told Maggie's mother that Maggie was on the "borderline" for qualifying for the full-day program.  N.T. 2/6/2020 at 1757-58, 1761.  Maggie was ultimately not included when the limited number of full-day spots went to other children deemed needier by the district.  N.T. 9/24/2019 at 5.

Maggie's mother continued to advocate for additional instruction and services, S-54 at 1, and in December 2015 formally requested evaluation for speech, processing disorder, general IQ testing, and an adaptive behavior assessment.  S-6 at 1.  Maggie's mother explained that she specifically requested an adaptive behavior assessment because such an assessment had helped Maggie's older sister.  N.T. 2/6/2020 at 1764.  In her contribution to the evaluation, however, she noted only that Maggie's medical and mental health history were "unremarkable."  Id. at 1851.

Maggie's evaluation was conducted by Kathryn Parker, then a school psychology intern, and it included testing, teacher and parent reports, and classroom observation.  S-9.  Maggie's Full Scale IQ ("FSIQ") of 78 was on the "borderline" of intellectual disability, but the report noted "her performance should be interpreted with extreme caution as her impulsivity and high activity level likely contributed to her overall performance, thus rendering her scores under-representative of her actual ability."  Id. at 8.  Although Maggie's "classroom performance [was] . . . well below kindergarten curricula," the evaluation did not demonstrate a specific learning disability because her "achievement [was] commensurate with and higher than her ability given her IQ score."  Id. at 8-11.

Similarly, although Maggie was "fidgety and distracted" in the classroom and her teacher requested that she have small group instruction with more time and fewer distractions, during the classroom observation she did not disrupt those around her, was pleasant with her peers and teacher, and generally did not show "clinically significant levels of social, emotional, or behavioral difficulties with the school setting, which would typically be seen in children diagnosed with an Emotional Disturbance." Id. at 2, 12. Both Kathryn Parker and her then-supervisor, Drew Hunter, testified that distractibility and difficulty following directions are common behaviors for Kindergarten students. N.T. 9/24/2019 at 267, 282-83, N.T. 11/11/2019 at 498, 501, 507. Dr. Hunter testified that there is controversy over reaching an Attention Deficit and Hyperactivity Disorder ("ADHD") diagnosis in children younger than six years old because these behaviors are so common. N.T. 11/11/2019 at 496.

Because Maggie qualified for speech and language services based on her expressive language skills, Donegal created a "speech only" Individualized Education Plan ("IEP") for her in March 2016.[3] No other special instructional services were included based on Parker's evaluation. S54 at 8. Donegal also determined that Maggie did not qualify for "extended service year" instruction ("ESY"), i.e. additional instructional services over the summer, noting there were no reports from her parents "regarding negative changes in adaptive behaviors or in other

---

[3] The Hearing Officer accurately noted Donegal misapplied the IDEA statute by categorizing Maggie's IEP as "speech only" and limiting the services available to her on that basis. H.O. Op. at 16 ("There is no such thing as a 'speech only' IEP."). Although speech is a category under which a child can qualify for special education services, 20 U.S.C. § 1401(3)(A)(i), once a student has qualified for services under any category, that student is entitled to whatever services are required to access a FAPE, id. § 1414(d). The Hearing Officer also accurately noted that it is possible for a school district to provide FAPE even while it procedurally violates the IDEA statute. H.O. Op. at 18; but see Endrew F., 137 S. Ct. at 1000 ("the procedures are there for a reason, and their focus provides insight into what it means, for purposes of the FAPE definition, to 'meet the unique needs' of a child with a disability").

skill areas." S-10 at 1. Maggie's mother agreed with this assessment and knew she had the right to challenge the assessment at a due process hearing. N.T. 2/6/2020 at 1852, 1857.

In April 2016, Maggie's parents began having her privately assessed for ADHD. S54 at 9-10, P6 at 1. In April and May 2016, Maggie's parents received two emails from her kindergarten teacher letting them know Maggie had used a bad word in the library and ripped a library book. P7 at 1-2. In May 2016, a private psychological assessment recommended: (1) parent-child interaction therapy; (2) no medications; (3) increased community activities; and (4) updating her psychological evaluation in the future. P9 at 8-9. Maggie's kindergarten report card showed she had "met expectations" in most areas, although her skills were still "improving" in others. S51 at 1.

By August 2016, Maggie had been diagnosed with Reactive Attachment Disorder ("RAD") and Oppositional Defiant Disorder ("ODD"), and her providers were still considering diagnoses of separation anxiety disorder and ADHD. S15 at 1, S16 at 1. When Maggie's mother submitted documentation of Maggie's RAD diagnosis to Dana Blair, who had moved from the position of principal to Special Education Director, Blair told Maggie's mother that RAD was "not a school diagnosis." P11 at 1. Maggie's mother suggested placing Maggie in an emotional support classroom in August 2016, but Maggie's first grade teacher did not think Maggie needed that level of intervention. S54 at 11. Donegal had a policy of requiring students to try three "tiers" of interventions in both academic and behavioral areas before evaluating them for special education services or adding new services to their IEPs. N.T. 9/24/2019 at 121.

Maggie's first grade teacher and mother were in almost daily contact over email, with her teacher reporting the details of Maggie's in-school behavior and her mother following up with consequences at home. See, e.g., P13 at 2 (September 8, 2016 emails regarding a paper clip

Maggie brought home that did not belong to her), S54 at 13 (September 9, 2016 emails regarding Maggie throwing away her backpack and her mom's request that she bear the natural consequences of this action), P13 at 4 (September 14, 2016 emails about negative behaviors and mother's request to receive behavior emails earlier in the day so that she can structure consequences for Maggie the same afternoon as the behavior). By mid-September 2016, Donegal had included Maggie in additional small-group and individual programming with the guidance counselor, although these "tiered" interventions were not part of her IEP. P15 at 1; N.T. 1/15/2020 at 1740. By early October 2016, Maggie's mother and teacher were discussing whether and how to obtain a therapeutic support services ("TSS") aide to help Maggie in school. P16 at 2, S54 at 17-18.

By late October 2016, Maggie's behavior was beginning to warrant not just redirection but discipline, S5 at 4, and by early November 2016 the new principal, Chris Miller, was notified about Maggie's behavior when she was disciplined for eating out of a trash can, S54 at 19, S55 at 5, P18 at 1, P19 at 1. At this point, Maggie's teacher was formally tracking her behavior throughout the day and the incidents warranting discipline were increasing. P19 at 3 (teacher was filling out behavior tracking sheet); see also, e.g., S55 at 6 (November 9, 2016 discipline notice for yelling), S55 at 7 (December 13, 2016 discipline notice for taking off shoes and socks and wandering down the hall), S55 at 8 (December 14, 2016 discipline notice for standing on a chair, eating soap, and disrupting class). Maggie's behavior was escalating outside of school as well. See, e.g., P17 at 10 (November 16, 2016 email from Maggie's mother informing teacher of a bad therapy session where Maggie ripped up papers), S54 at 22-23 (December 4, 2016 email from Maggie's mother informing teacher that Maggie had run away from the babysitter over the weekend and been brought home by police). In December 2016, Maggie was formally evaluated

for a TSS aide and also began family-based therapy.  P24 at 1.

Over the 2016-17 Christmas break, Maggie's medications were adjusted.  S54 at 27.  In January 2017, Maggie's mother was surprised to learn that Maggie was participating in small group and one-on-one work with the school guidance counselor, but the guidance counselor answered her questions about the work, including the specific social and behavioral skills being addressed.  S54 at 26.  Maggie's mother let Donegal know that their family therapist had recommended Maggie receive hugs only from her parents as part of her RAD treatment and requested staff to refrain from hugging Maggie.  P26 at 1.  On January 27, 2017, Maggie's mother met with her teacher and the guidance counselor.  S54 at 27.  She shared information regarding Maggie's treatments, notified them that Maggie would have a TSS aide beginning in February, and requested that Donegal retain Maggie in first grade.  Id.  Maggie's teacher and guidance counselor refused to commit to retention and noted that Maggie had begun to receive Tier 3 services, i.e. the most intensive support available without an IEP, only on January 24, 2017.  Id.

Maggie's parents refused to sign a March 3, 2017 Notice of Recommended Educational Placement ("NOREP") that would have continued to provide only the lowest level ("itinerant") of speech and language support.  S19 at 2-3.  Instead, they requested a meeting to discuss whether Maggie should: (1) be categorized as having an "emotional disturbance" based on her mental health diagnoses; (2) have specially designed instruction ("SDI"); (3) go to summer school; or (4) be retained in first grade.  S54 at 28.  Internal emails show that neither Maggie's teacher nor her principal thought her academic progress was limited enough to warrant retention. P31 at 1, S54 at 28.

On March 23, 2017, another "speech only" IEP that did not provide ESY services was

put in place for Maggie. S21 at 15-16. It also did not include a Positive Behavior Support Plan ("PBSP") due to Donegal's erroneous position that behavioral supports could not be put in place without a formal re-evaluation that would move Maggie's IEP from the "speech only" to the "emotional disturbance" category; although the re-evaluation to potentially re-categorize her was taking place at that time, it had not been completed by the March 2017 meeting. P33 at 2; P38 at 1. Nonetheless, Maggie's IEP team put in place a tiered behavior plan that consisted of specific goals, data collection, and activities. P36 at 1; see also N.T. 1/15/2020 (testimony from the Donegal Primary School Principal that "tier 3" behavioral interventions, although still short of IDEA services, require formal plans). The tiered behavior plan required Maggie's first grade teacher and TSS aide to tally her misbehaviors throughout the day and assign her red, yellow, or green stickers depending on the number of tallies at the end of the day. P36 at 1. Although Maggie obtained a TSS aide as a medical benefit, rather than through Donegal, Maggie's teacher coordinated with the TSS and Maggie's private therapist to ensure that Maggie was receiving consistent behavioral support. P39 at 4 (April 7, 2017 emails reflecting coordination).

On March 24, 2017, Maggie's first grade teacher was forced to clear the other students from her classroom when a series of Maggie's noncompliant behaviors escalated into a conflict with her TSS and a tantrum that included her chewing on electrical wires and destroying classmates' projects. S54 at 31, S55 at 10. Todd Travitz, Donegal's special education consultant, responded to a hypothetical inquiry from one of Maggie's teachers about a student with Maggie's behavior by noting that students "should really work through a tiered behavior intervention system unless those behaviors are so bad that they can't be controlled to the point of sending the student home on a daily basis." P33 at 2. Mr. Travitz then guessed that the student in question was Maggie and noted that the Director of Special Education had already sent a

"permission to evaluate" ("PTE") form to Maggie's parents so she could be assessed in anticipation of creating a PBSP, the formal plan for behavioral interventions included in IEPs. P33 at 2, 4; see also 20 U.S.C. § 1414(d)(3)(B)(i).

Maggie's negative behaviors continued throughout April and May 2017, both at school and at home. See, e.g., S55 at 13 (April 24 2017 discipline for making a fist at other students and hurting a friend while being unsafe with chairs), S54 at 40 (May 4, 2017 email from mom that Maggie was almost hospitalized for behavior the previous evening except that the hospital had no room for additional admissions). On May 16, 2017, Maggie's re-evaluation report was finalized and she was found to meet "the eligibility criteria for emotional disturbance." S23 at 19. She was also found to have mastered all the speech goals in her prior IEPs. S23.

Maggie's IEP was not revised to include a PBSP that spring because, on May 19, 2017, Maggie entered into a partial hospitalization program,[4] and her mother let the school know not to expect her back for the balance of the year. S54 at 41. Maggie's first grade report card was worse than her Kindergarten report card, but still showed she had "met expectations" in many academic areas. S51 at 3. Maggie's IEP team agreed to wait to revise her IEP in response to the re-evaluation report the following year, when it could be designed by the second grade team who would be responsible for its implementation. P47 at 1.

For second grade, Maggie was assigned a teacher scheduled for maternity leave during the first half of the year. S54 at 46. The principal refused to change this assignment even though

---

[4]     There is some indication in the record that Donegal staff were delaying producing Maggie's report in an effort to avoid revising her IEP that school year. P42 at 2 (4/28/2017 email from Drew Hunter to Todd Travitz noting that he "might as well wait until closer to the 18th so we don't have to deal with this this year"). These efforts did not deprive Maggie of FAPE because of her unexpected hospitalization but could certainly have warranted compensatory education if she had not.

Maggie's mother objected, stating it would likely cause behavioral problems due to Maggie's difficulties with transitions. S54 at 45. He testified that he felt so strongly this particular teacher would be the best fit for Maggie that any transition difficulties would be worthwhile. N.T. 1/15/2020 at 1732. Maggie's revised second grade IEP required her teacher to track her behavior every 20 minutes with respect to: (1) noncompliance (e.g. not raising her hand before calling out, or not following directions); (2) keeping her hands/feet to herself; (3) using only kind words; and (4) staying in her assigned area. S28 at 10. Although her speech therapy was discontinued, the speech therapist continued to provide quarterly half-hour consultations with Maggie's teacher throughout the year to advise on how to undertake any necessary learning supports in this area in the general classroom. S25 at 7. Maggie visited the support classroom for three behavior check-ins daily as well as to receive small group instruction daily for 30 minutes in writing and 20 minutes in math. S54 at 49. Maggie was also permitted to utilize the learning support room when necessary for de-escalation. Id.

Unfortunately, only two days after this plan was put in place, Maggie was again hospitalized. S54 at 48. When she returned to school a little over 10 days later, her mother requested that she be put full-time into the support classroom, at least for the transition period. Id. at 50-51. Donegal declined, explaining that her new PBSP had appeared sufficient during the two days before her hospitalization. Id. at 50.

On September 28, 2017, Maggie began mental health treatment with Pennsylvania Counseling Services ("PCS"). Her initial PCS evaluation noted that her behaviors were better at school than at home, and that she was using the "Zones of Regulation" program to identify and manage her emotions. S44 at 5-7. During the rest of that calendar year, Maggie's second grade teacher charted her behavior and shared those charts with her mother. P61. In October,

Maggie's medications were adjusted, P62 at 3, and her occupational therapist noted the effect of her emotions on her handwriting, P63 at 1. By December 11, 2017, Maggie's teacher noted in an email to her mother that Maggie had begun to display remorse and even self-correct disruptive behaviors. P61 at 100.

In January 2018, Maggie's assigned second grade teacher returned from maternity leave and took over completing Maggie's behavior charts. P61 at 129. A January 28, 2018, PCS evaluation noted that Maggie's in-school noncompliant behaviors were now similar to her peers, and that she was able to correct her behaviors with prompting, even though her behavior tended to be worse in the afternoons, especially at home after school. S44 at 5; see, e.g., P61 at 122 (Maggie's January 10, 2018 behavior chart notes only a "few instances of calling out").

In February 2018, Maggie's mother inquired about several missing behavior charts, and her teacher conceded they had not been maintained when she had been absent for two days and that she had not been able to locate two others days' charts. P67 at 24. Maggie's mother testified that she doubted the accuracy of the behavior charts. N.T. 2/26/2020 at 1820. In March, Maggie missed the first part of an assembly her parents attended when she failed to follow the rest of her class into the auditorium. P67 at 46. In April 2018, Maggie's mother complained to her teacher that several mornings were filled in on behavior charts even though Maggie had arrived late on those days. Id. at 63. Maggie's teacher explained that she was filling in the charts at lunch and at the end of the day and that those notations reflected Maggie's behavior from the start of her school day. Id.

In June 2018, Maggie began to undergo an Independent Educational Evaluation ("IEE") that included in-school observation and testing. S30. When Maggie's IEP progress was evaluated that month, she was found to have made excellent progress in the first and third

12

quarters with her writing and to have "mastered" her writing goal in the fourth quarter. P69 at 1. For her "following directions" goal, she was rated as "progressing" for the first three quarters and "making excellent progress" in the fourth quarter. Id. at 4. With respect to keeping her hands and feet to herself, using kind words, and staying in her assigned areas, she was found to have made excellent progress in the first quarter and to have "mastered" those skills in the other three quarters. Id. at 7, 10, 13. Her second grade report card showed that she had "met expectations" in most areas, including "school-wide behavior," that most of her "progressing" ratings were in math, and that her only "needs improvement" rating was in math. P70 at 1.

A June 2018 PCS evaluation noted that Maggie had "increased her compliance at school and home significantly during the school year," although she still struggled with transitions, and had gradually gotten rid of her TSS aide at school because "Maggie did not respond to the TSS at school." S31 at 4. Her July 2018 PCS treatment plan included specific goals for increasing her compliant behavior and incorporated incentives and monitoring from her school behavior chart. Id. at 2-3. Under cross-examination, Maggie's mother conceded that she agreed with PCS's assessment of Maggie's progress during second grade, but attributed the improvement to private neurofeedback the family had provided, not her IEP. N.T. 2/6/2020 at 1904.

In August 2018, Maggie transitioned from Donegal Primary School, which runs through second grade, into Donegal Intermediate School, which includes third through sixth grades. N.T. 12/13/2019 at 1305. Maggie's parents also received the completed IEE report, which included observations from Maggie's June 2018 classroom. S30. The evaluator recommended: (1) two periods of special education support daily; (2) updating Maggie's IEP in September; (3) daily check-ins from the learning support teacher; (4) continuing family mental health services; (5) utilizing graphic organizers and engaging instruction; (6) teaching with "before, during, and after

activities"; and (7) employing ADHD strategies that include preferential seating, "cueing," reinforcement of on-task behavior, a daily behavior checklist and reward system, assistance with structuring and organization of tasks, reasonable breaks as needed, and frequent and consistent communication between home and school. S30 at 31-35. The IEE also included information for Maggie's teachers regarding RAD, anxiety disorders, listening comprehension strategies, and ADHD strategies. Id.

The IEP team met in September 2018, and Maggie's new IEP included: (1) continued behavior charting and frequent feedback regarding her success with self-regulation; (2) self-monitoring strategies to increase her awareness and independent behavior monitoring; (3) frequent review of the classroom behavioral expectations and visual reminders of those expectations in close proximity to Maggie; and (4) noise canceling headphones for independent work. S40 at 6-7. The new IEP noted that Maggie no longer qualified for occupational therapy services, but that the occupational therapist would monitor maintenance of her handwriting progress and self-regulation skills quarterly. Id. at 7. It provided for small group instruction in writing and math due to Maggie's behavioral needs, a PBSP, and accommodations for the PSSAs consisting of additional and extended rest breaks. Id. at 7, 9, 11.

The IEP included specific academic and behavioral goals for Maggie: scoring 85% on her writing rubric, and 85% on her behavior chart for two consecutive marking periods. Id. at 12. Maggie was provided 30 minutes of small group instruction in the emotional support classroom each day in writing and another 30 minutes per day in math, "frequent verbal reminders of incentives, frequent verbal praise and encouragement in order to increase Maggie's appropriate social/behavioral skills and task completion" by all staff, "ongoing observation and assessment to determine the function(s) of Maggie's behavior in order to update behavioral supports,"

"advance notice to plan for changes in her normal routine to alleviate her worry about what comes next," and "daily behavioral checks (arrival & dismissal)" by the emotional support teacher "to discuss daily goals and reinforce positive behaviors." Id. at 13. The plan provided one hour and fifteen minutes of support per month to Maggie's General Education Teacher, and found Maggie was not eligible for ESY. Id. at 14. Because the plan kept Maggie out of her general classroom for less than 20% of the day, it was still considered "itinerant support." Id. at 15, 17 (she would be in the regular classroom for 81% of the day).

Shortly after her September 2018 IEP meeting, Maggie's parents retained a lawyer to represent them in the IDEA process. S40 at 23. They refused to sign off on the new IEP, opining that it did not include the IEE recommendations. S38 at 3. Maggie's mother testified that the September 2018 was "a good start," but that "it didn't have enough supports" for Maggie. N.T. 2/26/20 at 1835.

Throughout the fall of her third grade year, Maggie's teacher charted her behavior on a scale of one to three every half-hour on a google form that was accessible to her mother in real time. N.T. 12/13/2019 at 1459; P75. Maggie continued to demonstrate minor noncompliant behaviors like calling out or talking to her peers in class that were reported only in her behavior chart, and more significant behaviors, like chewing the cord off of a headphone, that were reported to Maggie's mother via email. P75 at 3-10, P77 at 1.

A December 2018 PCS evaluation stated that Maggie had "increased her compliance at school and home significantly," although she was still struggling with transitions like the upcoming winter break. S44 at 4. PCS noted that "her behaviors in the school setting have been mostly stable," meaning that her behavior was imperfect but redirectable. Id. Her providers noted that she had "good" identification of her emotions, was able to perform breathing

techniques well with prompts, and that prompts were being used consistently by all her teachers across her classrooms and specials.  Id. at 7.

In January 2019, Maggie's mother told the school that she did not want Maggie using computers that could access the Internet and was angered when the school appeared not to honor that request.  P77 at 6.  Maggie's teachers worked with her mother to find a way for Maggie to utilize the online academic programs necessary for the school's writing and math programs, and they were ultimately able to figure out a compromise.  Id. at 7; S49 at 8.  Maggie's behavior appeared to escalate throughout the early part of 2019, and in February 2019 Maggie's IEP was changed to add math goals and 15 minutes per week on "Zones of Regulation" instruction.  S49 at 1.  This change increased her to a "supplemental," rather than "itinerant," level of service. S50 at 21.  Again, Maggie's parents were unsatisfied.  S48 at 3.

In mid-March 2019, Maggie had an explosive tantrum during which she threw books, desks, and tables, and ripped down a classroom display.  S55 at 16.  This incident began when she was denied a free milk from the cafeteria, a prohibition enforced at the request of her parents as part of the RAD treatment directed by her therapist.  S50 at 6.  A meeting was held to discuss the incident.  S50.  Maggie's team did not agree to change her IEP because they had not yet seen the results from the February changes to the IEP.  Id. at 1.  However, the team agreed to keep snacks from home at school so that she would not be provoked in this same way in the future. Id.  Less than one month later, Maggie had another major tantrum, left school grounds, and was found by local police talking to an unknown adult.  S55 at 17-18.  Her IEP was changed again to by increasing her behavioral goals and supports.  S29 at 5.

Maggie's third grade report card contained many "met expectations" and some "progressing" assessments, but also several C's and D's, including in work ethic and reading

foundational skills.  S51 at 6.  Maggie's behavior escalated significantly during the second half

of third grade, which her parents attributed to her insufficient IEP.  N.T. 12/13/2019 at 1484-85.

However, her mother also acknowledged that they were building a new home outside of

Donegal, and that Maggie was aware of the major transition to a new home and new school that

she would be experiencing shortly.  Id.  Maggie's third grade teacher attributed her behavior

escalation to the major transitions she was experiencing at home.  N.T. 1/15/2020 at 1630.

Maggie was not provided ESY services in the summer of 2019, and did not return to Donegal.

## DISCUSSION

I.    Statute of Limitations

IDEA claims are subject to a two-year statute of limitations that begins to run on the

"discovery date," i.e., when a student's parents knew or should have known that the district's

action or inaction violated their child's legal rights.  G.L. v. Ligonier Valley Sch. Dist. Auth.,

802 F.3d 601, 606 (3d Cir. 2015).  The "touchstone" of the discovery rule is "reasonable

diligence."  Vitalo v. Cabot Corp., 399 F.3d 536, 538-39 (3d Cir. 2005).  This means that, even if

a parent does not know of a legal injury, he or she "should have known" of the injury if

"reasonable diligence" would have revealed its existence by that date.  Id.  To the extent that a

parent waits more than two years from that date to file a complaint, his or her claims are limited

to damages that arose within the prior two years.  G.L., 802 F.3d at 611.  For timely filed claims,

however, "this limitations period functions in a traditional way, that is, as a filing deadline that

runs from the date of reasonable discovery and not as a cap on a child's remedy for timely-filed

claims that happen to date back more than two years before the complaint is filed."  Id. at 616.

Most IDEA cases analyze the applicable statute of limitations by identifying a "known or should

have known" ("KOSHK") date and calculating two years of damages on that basis.  McLean v.

Eastampton Sch. Dist., No. 19-11009, 2020 WL 728816, at *5 (D.N.J. Feb. 13, 2020)

(dismissing claim filed more than two years after the KOSHK date).

The Hearing Officer in this case did not identify a KOSHK date, but instead found that

"the Parents had near contemporaneous knowledge of the District's actions and inactions as they

occurred." H.O. Op. at 9. He limited Maggie's potential damages to those accruing in the two

years before her parents filed suit on January 16, 2019. Id.

The evidence supports the Hearing Officer's determination. Maggie's mother testified

that she had experience advocating for special education services on behalf of her children from

the beginning of Maggie's schooling; she knew exactly what kind of assessments to request even

in kindergarten. N.T. 2/26/2020 at 1764. She also knew what methods were available to

challenge service determinations. Id. at 1852, 1857. Finally, she was able to observe Maggie's

in-school performance during kindergarten when she volunteered in Maggie's kindergarten

classroom, id. at 1759-61, and had the benefit of near daily communication with Maggie's

teachers to understand the effects of the services that were put in place from first grade onwards.

See, generally, P13(emails with Maggie's first grade teacher) P61 (second grade daily behavior

chart and emails), P75 (third grade daily behavior chart). Maggie's FAPE claims are limited to

the two years before she filed her due process claim. G.L., 802 F.3d at 611.

II.    IDEA Claims

Maggie argues Donegal owes her compensatory education based on its failure to provide:

(1) a FAPE throughout her tenure in the district; (2) services to accommodate her emotional

disturbance before May 2017; (3) ESY benefits; and (4) services to accommodate her ADHD.

Pl. Br. at 2.

Every student is entitled to a FAPE. 20 U.S.C. § 1400(d)(1)(A). Schools must design

IEPs for all students who qualify for special education services, and those IEPs must be "reasonably calculated to enable the student to make progress appropriate in light of the student's circumstances." Endrew F., 137 S. Ct. at 1001. The IEPs must be calculated to produce more than just "de minimis" progress and students whose needs can be accommodated within general education classes should be able to progress through the grades. Id. at 996. IDEA also features a preference for educating special education students alongside the general population, which means schools are also required to provide their special education services in the "least restrictive environment" possible. 20 U.S.C. § 1415(a)(5). The adequacy of an IEP for a student who cannot be accommodated in a general education classroom requires a more fact-specific analysis. Endrew F., 137 S. Ct. at 1000-1001.

(1) FAPE

a. First Grade

The Hearing Officer evaluated Maggie's education by semester, beginning on January 16, 2017, the earliest date under the applicable statute of limitations. See Section I, supra. From January 16, 2017 through March 2017, the Hearing Officer found Maggie's behavior had improved as compared with the first half of that academic year and Donegal's "decision to not propose an evaluation [at this time] did not violate" Maggie's rights. H.O. Op. at 19. The evidence supports this finding.

The first half of first grade was when Maggie's teacher began the "tally" system, tallying her noncompliant behaviors in an effort to reward her when she received less than five tallies per day. P16 at 11. Maggie's parents identify serious behaviors by Maggie during this time, like eating out of the garbage can and stealing from other people happened more than once. P13 at 2, S54 at 13, 19, P21 at 1. Maggie's mother testified that, based on her understanding of RAD, she

took seriously behavioral incidents others would have described as "minor" because she anticipated their escalation. N.T. 2/6/2020 at 1910-11. However, she conceded that she would email the school for more information because Maggie's version of events was not always accurate, and there were significant differences between Maggie's behaviors at school and at home. Id. at 1931-32. She also agreed that Maggie's behavior improved when her medications were increased during Christmas break of first grade. S54 at 27; N.T. 2/26/2020 at 1883.

The school psychology intern who observed Maggie during kindergarten testified that Maggie's behaviors did not appear significantly worse than her peers. N.T. 9/24/19 at 267. Maggie's kindergarten and first grade speech therapist testified that, although Maggie was fidgety and distractible, her lack of focus was also usually "redirectable," and she "was very pleasant." Id. at 230-31. The case manager assigned to Maggie in March 2017 testified that she never saw any destructive behaviors, and that Maggie's level of distraction seemed typical for her age. N.T. 12/3/19 at 985. Maggie's 2017-18 special education teacher testified that behavioral interventions like providing stickers as positive reinforcement were successful, although they were stopped per Maggie's parents' request. N.T. 12/3/19 at 1032-33. She further testified that behavior Maggie's parents characterized as requiring her "removal" from class was, from her point of view, merely a "break" permitted in accordance with Maggie's behavior plan, in which Maggie was given the opportunity to manage her emotions using techniques like performing breathing exercises or walking laps. Id. at 1116-18.

The Hearing Officer's determination that Maggie's behaviors "improved" between January 16, 2017 and March 2017 is supported by the record H.O. Op. at 19. I further agree that Donegal did not violate Maggie's rights even if they agreed to evaluate assuming the March 2017 evaluation was undertaken pursuant to the request of Maggie's parents because "the

general education interventions that had worked to that point were no longer effective." But see P33 at 4 (Donegal had already begun paperwork for a re-evaluation in March 2017 when the parents' request was received).

The Hearing Officer's conclusion that "[t]he parties agreed to evaluate [Maggie] when it became clear that an evaluation was needed" is supported by the record. H.O. Op. at 19-20. His further conclusion that Donegal did not deny Maggie FAPE for the balance of that year because she attended school for only three days before she was hospitalized is also supported by the record. S54 at 41.

b. Second Grade

The Hearing Officer found Maggie was not denied FAPE in second grade. H.O. Op. at 27. He noted her revised IEP included appropriate goals, related services, and a PBSP. Id. at 24. He observed that Donegal and Maggie's parents communicated daily regarding Maggie's behavior logs, and that those logs generally reflected imperfect but redirectable behavior. Id. at 25-26. He also explained that Maggie met grade level academic expectations as measured by report cards and assessments, and that assigning Maggie to a second grade teacher who returned from maternity leave mid-year did not negatively affect her performance. Id. at 26 (citing S51 and S81).

The Hearing Officer further noted that, following a 10-day hospitalization early in second grade, Maggie's parents were "on high alert" during the school year, and that the constant detailed flow of information about her daily behavior may not have been helpful. H.O. Op. at 27. Nonetheless, Maggie's mother appeared to concede that Maggie was successful in second grade, although she attributed that success to Maggie's neurofeedback therapy, not her IEP. N.T. 2/26/2020 at 1904. I agree the record shows Maggie was not denied FAPE in second grade.

c. Third Grade

The Hearing Officer analyzed Maggie's FAPE in third grade in two separate spheres: behavioral and academic. Behaviorally, he found that there were only two major incidents in third grade: one where Maggie had a destructive tantrum after being denied an additional milk in the cafeteria, and the second where a tantrum led to leaving school property. H.O. Op. at 35. Otherwise, he concluded, her behavior was "substantively similar" to the previous year – i.e. "off task or non-compliant, but easily redirected." Id.

Maggie's parents argued that the two serious incidents prove Donegal should have been doing more for her. They contend it was not surprising that Maggie left school because her behavior had been escalating, and allege that it was the school's failure to consistently enforce their rules about no additional food that led to the destructive tantrum when that rule was enforced. N.T. 2/26/2020 at 1918, 1922. Maggie's mother conceded, however, that in December of Maggie's third grade year she had reported that Maggie was "doing well" and "having less behavior escalations in general." Id. at 1910.

The Hearing Officer concluded Maggie was not denied FAPE with respect to her behavioral learning because Donegal "had no reason to expected either occurrence before they happened," and "in both instances, [Donegal's] response was appropriate and consistent with IDEA mandates." H.O. Op. at 36. The Hearing Office found that the private evaluation conducted at the end of second grade "for the most part, confirmed information that was already available." Id. at 35. He noted that, after the milk incident, the IEP team immediately met and determined how to enforce the parents' snack rules without causing further problems. S50 at 1. After Maggie left school, "[t]he decision to not make changes because a new program had just started was reasonable." H.O. Op. at 36; see also N.T. 1/15/2020 (third grade teacher's

testimony that, after the elopement, additional precautions were taken with respect to outdoors activities).

I agree.  Donegal implemented extensive behavioral supports for Maggie throughout the year, consistent with the recommendations in her IEE.  To the extent that there were slight differences between the exact recommendations and those measures put in place by her team, they complied with the IDEA.  S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003) (IDEA does not require schools to provide "the best possible education").  Donegal increased the behavioral supports in Maggie's IEP in February 2019, before either of the major incidents that year.  SR 47 at 2.  Ironically, although her parents complained that Maggie did not receive FAPE in first grade because Donegal did not initiate the process of increasing her behavioral supports until after a major incident, in third grade they allege Maggie did not receive a FAPE because the district changed her IEP before a major incident instead of directly afterwards.

The record also shows that additional stressors Maggie may have been reacting to at this time related to transitions in her home life – her brother had begun home-schooling, and their family was planning a move from their current home and school district.  N.T. 12/13/2019 at 1484.  The Hearing Officer had sufficient evidence to conclude that it was reasonable for Donegal to wait to see how the February changes worked before making further changes to Maggie's behavioral support plan in mid-March.  Undertaking this systematic approach to her behavioral support did not deny Maggie FAPE.  S.H., 336 F.3d at 271.

Academically, the Hearing Officer explained that the parents' concerns were understandable because Maggie appeared to be performing at grade level at the end of second grade, but was assigned first and second grade math goals mid-way through third grade.  H.O.

Op. at 36. Nonetheless, he explained that Maggie was not denied FAPE. The February 2019 math goal targeted her "specific areas of weakness: applications and fluency," and "it was working." Id. a 36-37. Maggie mastered that goal by March 13, 2019, and it "was then revised to push" her to "a higher level." Id. at 37.

Maggie's third grade IEP gave her writing and math instruction in the emotional support classroom and evaluated her writing with a grade level rubric. Id. at 30. Her "time in a special education setting" increased from the previous year. Id. The Hearing Officer determined that "the private evaluation, for the most part, confirmed information that was already available to the District." Id. at 35. The evidence justified this finding. Maggie's parents refused to sign her first third grade IEP because of concerns that not every recommendation from the IEE was incorporated, but Donegal was not required to adopt every recommendation. S.H., 336 F.3d at 271. The IEPs Donegal offered during third grade were reasonably calculated to provide FAPE at the time they were made. Endrew F., 137 S. Ct. at 1001.

III.    Emotional Disturbance

Because Maggie was qualified for special education services based on an "emotional disturbance" following the re-evaluation initiated in March 2017, sufficient evidence supports the Hearing Officer's finding that the only time period for which Maggie could receive compensatory education based on a failure to identify her "emotional disturbance" is between January and March 2017. H.O. Op. at 19.

Maggie's parents argue Donegal violated its "Child Find" obligations during this time period. IDEA imposes a "child find" requirement on schools, by which they are required to seek out and evaluate for services any child who is reasonably suspected of requiring learning support or related services. 20 U.S.C. § 1415(a)(3); see also Ridley Sch. Dist. v. M.R., 680 F.3d 260,

271 (3d Cir. 2012).  Maggie's parents contend they informed Donegal about Maggie's RAD diagnosis and provided other information that should have led it to consider her "emotionally disturbed," and include a PBSP in her IEP before first grade began.  Pl. Br. at 42.  According to Maggie's parents, Donegal tried to stop her first grade teacher from collecting behavioral data and "did nothing" to help Maggie.  Id.

The evidence belies those claims.  Donegal explained that Maggie's educational team implemented a series of "tiered" behavioral interventions, P15 at 1, and the record shows her first grade teacher continued documenting and reporting her behaviors daily, S54 at 19.  Moreover, as described above, Maggie's behavior improved after she began taking medications during the 2016-17 Christmas break and did not escalate again until mid-March.  S54 at 27, 31; S55 at 9.  She also began working with the TSS aide around February 2017.  P24 at 1.  Contemporaneous internal communications at Donegal show that Maggie's IEP team was acknowledging her behavioral needs but attempting to design a program in the least restrictive environment possible.  P33 at 2.  Nonetheless, by mid-March, when Maggie's parents officially requested a re-evaluation for potential emotional disturbance, the school had already begun the paperwork for re-evaluating her.  Id. at 4.  The Hearing Officer concluded that, "[g]iven the elimination of the Student's most troubling (even if isolated) behaviors and the Student's overall behavioral improvement, I find that the District's decision to not propose an evaluation did not violate the Student's rights."  H.O. Op. at 19.  The evidence supports this finding.

Similarly, Maggie's parents contend Donegal's "speech only" IEP violated Maggie's right to FAPE by failing to include appropriate social/emotional/behavioral goals.  Pl. Br. at 44-45.  Although Donegal's erroneous application of a "speech only" IEP category had the potential to deny FAPE, it did not in this case because during this time frame Maggie's teachers were

already implementing a behavioral support program.  S54 at 26, P16 at 10.  Even her speech therapist was incorporating behavioral support into her services.  See N.T. 12/13/2019 at 991 (speech therapist added work on social language skills in response to parent concerns).  As Donegal's special education consultant explained, all students were expected to work through three tiers of non-IDEA behavioral supports before qualifying for specially designed behavior instruction, and he usually recommended emotional disturbance evaluations only when behaviors were so uncontrollable that a student was being sent home on a daily basis.  P33 at 2.  The small group and one-on-one work Maggie did with her school counselor was part of her Tier 1 and Tier 2 interventions.  Once Tier 3 interventions were necessary, Donegal implemented a formal written behavior plan.  N.T. 1/15/2020 at 1663-64.

In yet another variant of this argument, Maggie's parents contend that her ongoing negative behaviors at home show that even the successful behavioral interventions at school were unsuccessful.  Pl. Br. at 47-48.  The record shows Donegal consistently and earnestly communicated and cooperated with Maggie's parents, adjusting its program whenever necessary to ensure seamless coordination between her services at home and at school.  See, e.g., N.T. 12/3/2019 at 1139-40 (special education teacher began working on homework at school when parents communicated that homework was creating conflict at home).  Maggie's ongoing behavioral difficulties at home, when juxtaposed with the other evidence, fail to justify a finding that Donegal failed to provide her a FAPE at school.

IV.    ADHD

Plaintiffs further argue Donegal never provided an IEP that adequately addressed her ADHD.  Pl. Br. at 42-43.  They cite the IEE as evidence that even in kindergarten Maggie suffered from ADHD that was never addressed by her IEPs.  Id.

To address Maggie's ADHD, the IEE recommended: (1) preferential seating; (2) using a "cueing system" to signal child important information is coming; (3) reinforcing on task behavior; (4) utilizing a daily behavior checklist and reward system; (5) assisting in the structuring and organization of tasks; (6) offering reasonable breaks as needed; and (7) frequent and consistent communication between home and school.  S30 at 33-34.

The record shows Donegal utilized virtually all of these techniques throughout Maggie's education, even without an official ADHD diagnosis.  See, e.g., P6 (frequent communication between school and home), P13 at 6 and P67 at 59 (teachers addressed her behavior with seating), P16 at 10 (teacher proposed behavior checklist and rewards system in October of first grade); S54 (emails showing constant communication between home and school); P61 (second grade behavior chart); P61 at 81, 85 (Maggie was able to take reasonable breaks in November 2017) N.T. 12/13/2019 at 1123-24 (2017 special education teacher testimony that all Maggie's teachers new about her accommodations which required special instructions and preferential seating and that her TSS aide could help provide additional prompts).

IDEA requires only that schools accommodate students' learning conditions, not that they perfectly diagnose them.  See Chelsea D. v. Avon Grove Sch. Dist., No. 12-1554, 2013 WL 3556676, at *10 (E.D. Pa. July 15, 2013) ("Without evidence of educational performance issues, the diagnosis of a recognized condition is inadequate to trigger IDEA protections.") (citing Munir v. Pottsville Area Sch. Dist., No. 10–0855, 2012 WL 2194543, at * 12 (M.D. Pa. June 14, 2012)).  Because Donegal provided the accommodations necessary for  Maggie's ADHD diagnosis all along, it did not deny her a FAPE by failing to specifically accommodate an ADHD diagnosis.

V.    ESY

Donegal was required to consider seven factors when determining if Maggie was entitled to ESY. Those factors gauge whether services should be provided over a regular break in educational programming like summer vacation to prevent irreparable damage. The factors are: (1) whether an interruption in educational program causes a reversion to a lower level of functioning ("regression"); (2) whether the student can recover any skill lost due to regression ("recoupment"); (3) whether regression and/or recoupment would keep the student from meeting IEP goals; (4) the extent to which the student had mastered an important skill or behavior at the time of the interruption; (5) the extent to which a skill or behavior is particularly crucial to meet IEP goals of self-sufficiency and independence from caretakers; (6) the extent to which successive interruptions result in a student's withdrawal from the learning process; and (7) the severity of the student's disability, "such as autism/pervasive developmental disorder, serious emotional disturbance, severe mental retardation, degenerative impairments with mental involvement and severe multiple disabilities." 22 Pa. Code § 14.132.

The Hearing Officer "accept[ed] the Parents' argument that the District did not conduct an ESY analysis" in 2017 and 2018,[5] but nonetheless found in favor of Donegal on this claim because Maggie's parents failed to meet their burden of persuasion with respect to any of the seven factors. H.O. Op. at 23. The finding is supported by the evidence.

"IDEA does not require . . . ESY services merely due to a student's slow progress or low achievement levels. . . . All students experience some risk of regression. Therefore, only in the exceptional case, where essentially all progress made during the school year will be lost during the vacation break, are ESY services required." Coleman v. Pottstown Sch. Dist., 983 F. Supp.

---

[5]     Any claim for ESY in 2016 is foreclosed by the statute of limitations. See Section I, infra.

2d 543, 574–75 (E.D. Pa. 2013).  There is no evidence that Donegal's failure to provide Maggie

ESY services caused her to lose "all progress made during the school year."  Id.  Donegal's

failure to provide ESY services did not deny her FAPE and she is not entitled to compensatory

education on that basis.[6]  Id.

VI.    Additional Recovery

Because Plaintiffs are not the "prevailing parties" in this matter, attorneys fees are not

warranted.  20 U.S.C. § 1415(f)(3)(B).

An appropriate Order follows.

---

[6]    Like the Hearing Officer, I also accept that the evidence shows Donegal violated the procedure required by IDEA by failing to engage in a substantive determination regarding ESY services.  H.O. Op. at 23, 28 (noting that there is no evidence the IEP team substantively considered whether Maggie qualified for ESY in 2017 or 2018).  Nonetheless, Maggie cannot be awarded compensatory education on the basis of Donegal's procedural violation.  C.H. v. Cape Henlopen School Dist., 606 F.3d 59, 66-67 (3d Cir. 2010 (a procedural violation justifies compensatory education only where plaintiffs can show that procedural defects caused such substantial harm that a FAPE was denied).  Because Maggie was not denied a FAPE, I cannot award her compensatory education based on Donegal's ESY procedural violations.

Plaintiffs make a similarly technical argument by maintaining Maggie was not provided FAPE because her occupational therapy services were provided by an inadequately supervised assistant therapist.  Pl. Br. at 45-46.  But plaintiffs rely on a misunderstanding of the regulations, which specifically allow assistant therapists to undertake certain evaluations, 42 Pa. Code 42.22(c), and Maggie's therapist's testimony, which was that her initial evaluation was conducted by the supervising therapist, who thereafter had access to and the ability to revise all of her assistant's program notes.  N.T. 11/25/2019 at 818, 824, 827.